Currie, J.
The parties have stipulated that the company is engaged in business affecting interstate commerce within the meaning of the Labor Management Relations Act, 1947. The principal issue on this appeal is whether there exists federal pre-emption under such act which would preclude W.E.R.B. from exercising any jurisdiction over the activities of the union which were the subject of the complaints before it. A second issue is presented as to whether such activities constituted conduct prohibited by the Wisconsin Employment Peace Act (ch. Ill, Wis. Stats.), in the event it should be determined that there is no federal preemption. Because of the disposition made of the pre-emption issue we find it unnecessary to pass on such second issue.
In resolving the issue of pre-emption it is essential that we first examine the pertinent provisions of the Labor Management Relations Act and the Wisconsin Employment Peace Act. We deem these to be the following:
Sec. 7 of the Labor Management Relations Act, 29 USCA, p. 235, sec. 157:
“Employees shall have the right to self-organization, to form, join, or assist labor organizations, tO' bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such *283 activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in sec. 158 (a) (3) of this title.”
Sec. 8 (b) (1) of the Labor Management Relations Act, 29 USCA, p. 258, sec. 158 (b) (1) :
“(b) It shall be an unfair labor practice for a labor organization or its agents-—
“(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in sec. 157 of this title: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; . . .”
Sec. 111.04, Wis. Stats.:
“Employees shall have the right of self-organization and the right to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection; and such employees shall also have the right to refrain from any or all of such activities.”
Sec. 111.06 (2) (a), Wis. Stats.:
“It shall be an unfair labor practice for an employee individually or in concert with others:
“(a) To coerce or intimidate an employee in the enjoyment of his legal rights, including those guaranteed in sec. 111.04, or to intimidate his family, picket his domicile, or injure the person or property of such employee or his family.”
An examination of the above-quoted statutory provision discloses that sec. 111.04, Wis. Stats., provides substantially the same as does sec. 7 of the Labor Management Relations Act. Likewise sec. 111.06 (2) (a), Wis. Stats., corresponds *284 closely to the afore-quoted portion of sec. 8 (b)(1) of the Labor Management Relations Act except for the proviso provision of the latter, which reads as follows:
“Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; ” (Italics supplied.)
The parties concede that a fine imposed by a union pursuant to its constitution and by-laws upon a member, who has violated such constitution and by-laws by crossing a picket line during a strike in order to continue his employment, is a union activity embraced within the scope of such proviso. If it were not, then there clearly would be pre-emption because, if the union conduct at issue here constitutes illegal coercion, it would be prohibited under the Federal Act as well as the Wisconsin Employment Peace Act. Therefore, the crucial question is whether the congress by insertion of such proviso intended to make such an activity a protected one, or whether it intended that such union conduct should remain outside of the scope of congressional regulation so that the states might regulate it if they so desire. It is the latter interpretation that was adopted by the majority members of W.E.R.B. and the trial court.
One of the more-recent, as well as informative, decisions of the United States supreme court on the issue of preemption under the Labor Management Relations Act is that of San Diego Unions v. Garmon (1959), 359 U. S. 236, 79 Sup. Ct. 773, 3 L. Ed. (2d) 775. The test of preemption in the labor-relations field laid down in that decision is whether the activity (p. 246), “is arguably within the compass of sec. 7 or sec. 8 of the [Labor Management Relations] Act.” If it is, then the state’s jurisdiction is displaced and the issue must be decided by the National *285 Labor Relations Board and not by the court or the states. This is because that is the agency which the congress has clothed with authority to determine such issue. The failure of such board to define the legal significance under the act of a particular activity does not give the states power to act. Of particular significance is the following statement appearing at page 246 of the opinion:
“The governing consideration is that to allow the states to control activities that are potentially subject to federal regulation involves too great a danger of conflict with national labor policy.”
In such decision in the Garmon Case the United States supreme court did point to a type of activity that is not arguably within the compass of secs. 7 and 8 of the Labor Management Relations Act when it declared (pp. 243, 244) :
“However, due regard for the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy, has required us not to find withdrawal from the states of power to regulate where the activity regulated was a merely peripheral concern of the Labor Management Relations Act. See International Asso. of Machinists v. Gonzales, 356 U. S. 617 [78 Sup. Ct. 923, 2 L. Ed. (2d) 1018].” (Emphasis supplied.)
The afore-quoted statement, with its reference to the Gonzales Case, is most pertinent because such case has been cited by counsel on both sides of the instant appeal, and in the memorandum opinion of the learned trial judge. In that case Gonzales brought suit against the union in a California state court for restoration of his union membership and for damages, claiming that his expulsion from the union violated the union constitution and by-laws. Gonzales secured judgment in his favor which was affirmed by the California district court of appeal. The California *286 supreme court refused to accept an appeal to it, and the union then appealed to the United States supreme court. There the union did not question that part of the judgment which restored membership to Gonzales, but contended that there was federal pre-emption under the Taft-Hartley Act which precluded the state court from granting relief in the form of damages. The United States supreme court disposed of such argument by stating (pp. 621, 622) :
“The possibility of conflict from the court’s award of damages in the present case is no greater than from its order that respondent be restored to membership. In either case the potential conflict is too contingent, too remotely related to the public interest expressed in the Taft-Hartley Act, to justify depriving state courts of jurisdiction to vindicate the personal rights of an ousted union member. This is emphasized by the fact that the subject matter of the litigation in the present case, as the parties and the court conceived it, was the breach of a contract governing the relations between respondent and his unions.”
In the case of United Automobile, A. & A. I. Workers v. Woychik (1958), 5 Wis. (2d) 528, 93 N. W. (2d) 336, this court affirmed the judgment of the trial court in favor of the plaintiff union in an action to collect a fine against a union member for failure to picket during a strike. The union constitution and by-laws provided for the imposition of such a fine. Such provisions of the union constitution and by-laws were held to constitute a contract which the union was entitled to enforce by court action. Under the wording of the proviso of sec. 8 (b)(1) (A) of the Labor Management Relations Act, such a contract does not fall within the prohibitions of such act. The afore-quoted extract from the decision of the United States supreme court in International Asso. of Machinists v. Gonzales, supra, clearly indicates that the enforcement by state courts of rights arising under such a contract is too remotely related to the *287 public interest sought to be protected by the Labor Management Relations Act to require a holding that there exists pre-emption under such act.
The matters of public interest with which the congress sought to deal in enacting such act are clearly made manifest by sec. 1 thereof, 29 USCA, p. 150, sec. 151. One expressed purpose of such enactment was to correct the “inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association” by encouraging and protecting the exercise by workers in employments affecting interstate commerce of free collective bargaining.
When the provisions of sec. 7, together with that of the proviso of sec. 8 (b) (1) (A), of the act are construed together, it can well be argued that the congress has spelled out the balance of bargaining power it desires to maintain between unions and employers in employments affecting interstate commerce. This being so, then any attempt by the states to regulate union activity in such a way as to disrupt such balance would be an invasion of a field of regulation already pre-empted by the congress. This is the view voiced by Professor Archibald Cox of Harvard Law School in an address to the section of Labor Relations Law of the American Bar Association at its 1958 annual meeting (Report of the 1958 Proceedings of such section, page 21) :
“Freedom to strike, to picket, and to use other economic weapons affects the progress of union organization and the balance of power in collective bargaining. The progress of unionization and the balance of power affect the way collective bargaining works. . . . Since freedom to negotiate terms of employment implies freedom to reject the terms proposed by the other party, the framework necessarily includes the law of strikes and picketing. At each point formulating the national labor policy involved balancing *288 the various interests of management, union, employees, and public in union organization and collective bargaining as methods for establishing terms and conditions of employment. Any state law which affects the balance is inconsistent with the national labor policy embodied in the L.M.R.A. and, under the supremacy clause, cannot be applied in situations affecting interstate commerce.”
A union without power to enforce solidarity among its members, when it resorts to a strike in an effort to force an employer to agree to its collective-bargaining demands, is a much-less-effective instrument of collective bargaining than a union which possesses such power. Therefore, there is an intimate connection between the right of a union to fine members, who cross a picket line in order to continue to work during a strike called by the union, and the incidents of collective bargaining sought to be regulated by the Labor Management Relations Act. In view of this, it is difficult for us to conceive that such union activity is of “a merely peripheral concern of the Labor Management Relations Act.”
That there is an intimate connection between the ability of a union to fine a member, who crosses a picket line in order to continue to work during a strike called by the union, and collective bargaining is supported by an opinion rendered by the court of appeals for the Sixth circuit in Sanders v. International Asso. of Bridge, Structural & Ornamental Iron Workers (1956), 235 Fed. (2d) 271. There the court had before it the issue of the legality of a provision in a union constitution which was broad enough in scope to permit the expulsion for life of a member found guilty of violating certain other provisions of such constitution. The plaintiff Sanders had been so expelled for life. In passing on such issue the court declared (p. 272) :
“. . . the legal right of the union to take such action is recognized in the Labor Management Act, 29 USCA, *289 sec. 158 (b) (1) (A), where it is provided that the law ‘shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein.’ The expulsion and debarment of appellant Sanders for life was a valid exercise by the union of its powers under its constitution and a legal exercise of its rights under the pertinent statute. As has been well said, ‘A union must have authority to discipline its members, otherwise it will have no power to bargain effectively. [Citing note in Villanova Law Review, January, 1956, p. 190.]’ ” .(Emphasis supplied.)
Thus it is apparent that the arguments, in favor of holding that the activity of a union which fines a member for crossing a picket line in violation of the union’s constitution and by-laws is protected by the Labor Management Relations Act, are too potent to permit us to determine that such activity is not “arguably within the compass of secs. 7 or 8 of the act.” This being the case, no state agency or court, but only the National Labor Relations Board, has jurisdiction to determine whether such activity is protected by the proviso of sec. 8 (b) (1) (A) of the act. San Diego Unions v. Garmon, supra.
There are at least three decisions of the National Labor Relations Board in which it has been called upon to interpret the effect of such proviso.
The first of these is International Typographical Union (1949), 86 N.L.R.B. 951. In that case one of the activities of the union, which was contended to be an act of coercion prohibited by sec. 8(b) (1) (A) of the act, was threatening union members with expulsion if they failed to follow certain union-prescribed, collective-bargaining procedures. The National Labor Relations Board held that such “argument is squarely at odds with the unambiguous language of the proviso to sec. 8 (b) (1) (A), and the legislative scheme as a whole, and must therefore be rejected.” By footnote *290 to this holding the board quoted the language of such proviso and stated (p. 957) :
“It is unnecessary to do more than to mention the guarantee of a right to ‘prescribe’ rules extends to the enforcement of such rules as well.” (Emphasis supplied.)
The second pertinent decision of the National Labor Relations Board interpreting such proviso is that of Minneapolis Star & Tribune Co. (1954), 109 N.L.R.B. 727. There the board was concerned with a $500 fine which had been imposed by the union on a member, one Carpenter, because of his failure to take part in picketing during a strike. The board approved the holding of its trial examiner that the proviso of sec. 8 (b) (1) (A) of the Labor Management Relations Act precluded it from interfering with the imposing of such fine by the union. There was incorporated into the decision the report of the trial examiner. It appears from such report that the general counsel for the board took the position that the imposition of such fine constituted an act of coercion prohibited by such sec. 8 (b) (1) (A). The trial examiner rejected such contention and declared (p. 738):
“Congressional recognition of a labor organization’s right to make its own rules presumes, of course, its right to invoke them — except where the implementing of such rules is expressly prohibited, as in the case of affecting an employee’s employment rights.” [1]
One of the most-recent decisions by the National Labor Relations Board, in which it was called upon to interpret such proviso, is Allen-Bradley Co. (1960), 127 N.L.R.B. No. 8. There the company, as a condition to entering into *291 a new collective-bargaining agreement with the union, insisted that the union agree in principle to certain company-proposed contract clauses. Under these clauses the union would be precluded from restraining or coercing any of its members by “discipline, discharge, fine, or otherwise” from exercising any of their rights guaranteed by sec. 7 of the Labor Management Relations Act. Thus such a clause would have prohibited the union from fining members who crossed a picket line and continued to work during a strike in violation of the union’s constitution and by-laws. The board in its decision stated:
“Respondent [employer] has, by the breadth of this clause, encompassed in its proposals, and sought to bargain about, virtually every form of internal union discipline, including disciplinary powers expressly reserved to unions by the proviso to sec. 8(b) (1) (A) of the act. ... By thus intruding on rights guaranteed, to unions by the act, respondent’s proposed clauses clearly fell outside the scope of mandatory bargaining. Accordingly, we find that respondent violated sec. 8(a) (5) [2] by insisting at negotiations that the union agree to sucb proposals.” (Emphasis supplied.)
The foregoing quotations from decisions of the National Labor Relations Board make it abundantly clear that such board interprets the proviso as having the effect of making the enforcement by a union of its own constitution and bylaws a protected activity under the Labor Management Relations Act. We deem that such 'interpretation is certainly a permissible one in view of the use by the congress of the word “right” in the proviso when referring to the union activity of prescribing 'rules for acquisition and retention of membership.
*292 ■ Therefore, we conclude that such interpretation by the National Labor Relations Board is controlling on the issue of pre-emption, and that W.E.R.B. was without jurisdiction in the instant proceedings.
By the Court. — Judgments reversed, and causes remanded with directions in Case No. 59 to vacate and set aside the order of the Wisconsin Employment Relations Board.

 In the instant appeals no question was raised that the provisions of the union’s constitution and by-laws providing for the imposition of the fines upon the employees, who crossed the picket lines, violated the employment rights of such employees.

Sec. 8 (a) (5) of the act, 29 USCA, p. 258, sec. 158, is the provision which makes it an unfair labor practice for an employer “to refuse to bargain collectively with the representatives of his employees.”