UNITED AUTOMOBILE, AIRCRAFT & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, AFL-CIO, LOCAL 283, Respondent, v. SCOFIELD, Appellant.

*No. 90. Argued January 8, 1971.—Decided February 5, 1971.*
(Also reported in 183 N. W. 2d 103.)

120

For the appellant there were briefs by *James Urdan* and *Quarles, Herriott, Clemons, Teschner & Noelke,* all of Milwaukee, and oral argument by *Mr. Urdan.*

For the respondent there was a brief by *Charne, Glassner, Tehan, Clancy & Taitelman* of Milwaukee, and oral argument by *Irvin B. Charne.*

HEFFERNAN, J. Defendant argues that this court should refuse to enforce the lower court judgment because to do so would violate certain rights conferred upon Scofield by the Wisconsin Employment Peace Act (ch. 111, Stats.). His argument thus rests upon the correctness of his assertion that state labor law is applicable. Since both the state and the United States have passed labor relations laws, the possibility of conflict arises. Under the supremacy clause of the United States Constitution, the state labor law is obliged to give way to a contrary federal policy. Yet, it is clear that states have been by no means excluded from their sovereign prerogative to regulate both labor and management in the promotion of industrial peace; and numerous states, including Wisconsin, have enacted employment peace acts. Where the labor policy of the federal government has not pre-empted the field of labor relations, the states are free to act.

In *Machinists v. Gonzales* (1958), 356 U. S. 617, 619, 78 Sup. Ct. 923, 2 L. Ed. 2d 1018, Mr. Justice FRANKFURTER alluded to the confusing problems of conflicting claims of federal and state jurisdiction that have arisen out of labor laws of the various jurisdictions. He said:

"The statutory implications concerning what has been taken from the States and what has been left to them are of a Delphic nature, to be translated into concreteness by the process of litigating elucidation."

A year later, the supreme court gave voice to such "elucidation" in *San Diego Unions v. Garmon* (1959), 359 U. S. 236, 79 Sup. Ct. 773, 3 L. Ed. 2d 775. Therein the court said:

"When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by sec. 7 of the National Labor Relations Act, or constitute an unfair labor practice under sec. 8, due regard for the federal enactment requires that state jurisdiction must yield." (p. 244)

"When an activity is arguably subject to sec. 7 or sec. 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." (p. 245)

The supreme court also pointed out that state jurisdiction was appropriate if "the activity regulated was a merely peripheral concern of the Labor Management Relations Act." (p. 243)

However, the NLRB may find that the activity is neither protected by sec. 7 nor prohibited by sec. 8 "and thereby raise the question whether such activity may be regulated by the States." (p. 245) If the NLRB fails to determine the status of the disputed conduct and thereby leaves the legal significance of the activity clouded:

"In the absence of the Board's clear determination that an activity is neither protected nor prohibited or of compelling precedent applied to essentially undisputed facts, it is not for this court to decide whether such activities are subject to state jurisdiction." (p. 246)

The *Garmon* court concluded its discussion of preemption, saying:

"The governing consideration is that to allow the States to control activities that are potentially subject to federal regulation involves too great a danger of conflict with national labor policy." (p. 246)

In the instant case, some of these bench marks have been clarified by litigation on this very case in the federal courts as well as before the NLRB.

In the instant labor controversy, while the action for the collection of the fine was held in abeyance in the state courts, the case progressed from the filing of charges before the NLRB to an adjudication in the United States Supreme Court.

The NLRB (145 NLRB 1097) held that the union enforcement of the fine did not constitute action to restrain or coerce employees in the exercise of the rights guaranteed in sec. 7. Hence, it was found not to be an unfair labor practice. In addition, the NLRB held (145 NLRB 1097, 1099ff; *see also* dissent, 1111) that the conduct here was protected by the proviso to sec. 8 (b) (1) (A) that states:

". . . this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein . . . ."

Such is the clear import of the majority opinion of the NLRB, and it was so interpreted by the dissenting member. The NLRB itself did not adopt the conclusion of the trial examiner, who held that, although the conduct was not prohibited by sec. 8, it was not protected by the proviso.

The United States Supreme Court in *Scofield v. NLRB* (1969), 394 U. S. 423, 89 Sup. Ct. 1154, 22 L. Ed. 2d 385, affirmed the position previously taken by the NLRB that the enforcement of the fine against Scofield was not prohibited by sec. 8 (b) (1) (A) because it did not coerce or restrain him in the rights guaranteed him by

sec. 7 of the NLRA. The United States Supreme Court did not discuss the question of whether the fine was protected by the proviso. It based its decision wholly on its conclusion that there was no unfair labor practice under sec. 8. In making that decision, it was not necessary to discuss the effects of the proviso. It did, however, in a footnote, express approval for the trial examiner's statement that the proviso does not offer affirmative protection to the union's disciplinary action but merely serves to indicate that the action did not constitute an unfair labor practice.

In applying the *Garmon* rules to this set of facts, it is apparent that the NLRB having determined that the union activity is protected by the proviso to sec. 8 (b) (1) (A), this court (as well as the federal court) must defer to the competence of the NLRB.

The situation herein is almost identical to that faced by this court in *Local 248 UAW v. Natzke* (1967), 36 Wis. 2d 237, 153 N. W. 2d 602. That case also involved a union disciplinary fine. The NLRB, as in the present case, had found the conduct did not constitute restraint or coercion of the defendant in the exercise of his right to refrain from concerted activity; and also, as here, it found the conduct was protected by the proviso to sec. 8 (b) (1) (A). 149 NLRB 67 (1964). We held in *Natzke* that, under the precepts of *Garmon,* this court had no authority to apply state labor policy, and therefore refused to do so and permitted the recovery of the fine under ordinary principles of contract law.

We conclude that a similar conclusion is warranted here. A fair reading of the series of orders and judgments in the course of litigation in the federal area shows that the trial examiner believed the activity not prohibited but not protected either. The NLRB concluded that the conduct was not prohibited, and in fact was protected by the proviso. The United States Supreme Court specifically concluded that the conduct was not

prohibited, but only in an "aside," by way of a footnote, wholly dicta in this case, indicated its preference for the trial examiner's interpretation of the proviso.

It is clear that, under this state of "litigating elucidation" (although not necessarily elucidating litigation), the last word on the question of the effect of the proviso has been spoken by the NLRB, and not by the United States Supreme Court. It can hardly be said with certainty that by an "aside" footnote the supreme court intended to overrule the NLRB, to which it has so often said it must defer. Certainly, it must still be said that arguably the NLRB has at least for the moment spoken the last word. We therefore conclude, as we did in *Natzke, supra,* page 246:

"Until such time as the United States Supreme Court has spoken with finality on the issue, Wisconsin, under the rule of pre-emption laid down in *San Diego Unions v. Garmon* [(1959), 359 U. S. 236, 79 Sup. Ct. 773, 3 L. Ed. 2d 775] must defer to decisions of the NLRB which have held that state court enforcement of such fines is protected by the proviso to sec. 8 (b) (1) (A) of the National Labor Relations Act."

Moreover, even without determining the ultimate and precise balance between the present orders of the NLRB and the mandate in *Scofield,* it is apparent that for this court to apply state law which would prohibit what the NLRB and the United States Supreme Court have said are not unfair labor practices would interfere with the national labor policy.

Not only under the "concreteness" that has come out of *Garmon,* but on the basis of the policy factors behind the pre-emption doctrine, it is apparent that state labor policies that contravene the declared federal policy ought not be pursued. For this court to take the position, on the basis of state statutes (sec. 111.06 (2) (a) and sec. 111.04, Stats.) which are almost identical to sec. 8 (b) (1) (A) and sec. 7, that the enforcement of the union

fine endangers industrial peace would be near absurd in the face of the judgment of the Congress, the NLRB, and the United States Supreme Court that industrial peace is not thereby endangered.

The underlying subject of the series of federal cases was, of course, the union's production ceiling. It is argued by the defendant that this violates sec. 111.06 (2) (h), Stats., which provides:

"To take unauthorized possession of property of the employer or to engage in any concerted effort to interfere with production except by leaving the premises in an orderly manner for the purpose of going on strike [is an unfair labor practice]."

We need not pause to comment on the union's rather cogent point that, under the broad sweep which defendant would give to the words, even the eight-hour day would "interfere with production." It is enough to point out that another of the criteria of *Garmon* may well control this point. The United States Supreme Court stated that courts were pre-empted from interfering with activities that were protected by sec. 7 of the LMRA or arguably protected by that section. Section 7 provides:

"Employees shall have the right to . . . engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."

Both the NLRB and the United States Supreme Court extensively discussed abuses of the incentive system and pointed out that labor's experience has frequently proved the necessity of imposing a production ceiling. The supreme court also pointed out that, in the instant case, management, too, was well served by the ceiling, and if it had not been adopted by the union, management would have been obliged to invent it to preserve quality standards. The NLRB and the supreme court pointed out that unions to protect themselves from the abuses of the

piecework system had decided to engage in the concerted activity of establishing and enforcing a ceiling rate. While neither the court nor the NLRB in this series of cases has had occasion to rule on the practice, both took the opportunity to point out the rationale and possible justifications for concerted labor activity to minimize the effects of incentive pay abuses. Under these facts, the concerted action of the union in establishing ceiling rates is at least arguably protected by sec. 7 of the federal labor relations act. As a consequence, Wisconsin courts are not at liberty to apply Wisconsin labor law in respect thereto.

Even though the interpretation of sec. 111.06 (2) (h), Stats., urged by the defendant were found to be a currently acceptable declaration of state policy, and accordingly a contract which contravenes that policy was arguably unenforceable in the state courts, to effectuate that state policy in the face of an arguably contrary federal policy would fly in the face of the supremacy clause. We, therefore, conclude that sec. 111.06 (2) (h), is enunciatory of a state policy that cannot be applied herein. The state policy is contrary to a federal policy on the instant subject and should not, in a field where pre-emption is recognized, be used to defeat an otherwise valid contract claim.

We, moreover, though reserving the question, have great doubts that the statute could now be interpreted as being applicable to ceiling rates on piecework. Wisconsin Employment Relations Board (hereinafter the WERB) rulings that defendant contends reached the opposite conclusion are of present doubtful validity, and the WERB has not had the opportunity to rule on the question in view of recent NLRB decisions. This court should, therefore, in deference to the WERB, decline to determine whether state labor policy, even if not subject to pre-emption, would prohibit enforcement of the union's fine.

We thus conclude that the law to be applied to the enforcement of the union's claim is ordinary contract law—untinged with the penumbra of possible restrictions of Wisconsin's labor law that defendant claims should be invoked to defeat the contract action.

Various defenses on a contractual basis have been raised:

1. That defendant was not a member of the union when the $100 fine was imposed and, hence, not subject to its jurisdiction.

2. That the union ought to be limited to the "expulsion" of its members for violation of disciplinary rules.

3. That the terms of the membership contract providing fines for "conduct unbecoming a union member" are too vague to be enforceable.

4. That the "fine" is a penalty and is not sustainable as a damage award in a contract suit.

5. That the resolution was insufficient to create a contract and, in any event, was not binding, since it was not ratified by the international.

*Was Scofield a union member at the time the $100 fine was imposed*

The county judge who first heard this cause dismissed the complaint on the ground that Scofield, at the time the $100 fine was imposed, had been suspended for failure to pay the earlier 16 one-dollar fines and, therefore, was not a member of the union subject to its jurisdiction. This determination was reversed on appeal to the circuit court. We agree with the latter position.

The liability of a member of an association for fines levied by the association depends upon the contract of the member with the association as embodied in the by-laws and articles of the association. 7 C. J. S., *Associations*, p. 73, sec. 31.

A suspended member is not a member "in good standing." By-laws, art. XIII, sec. 3. However, that does not mean he is not a "member" of the union. Art. 30, sec. 10 of the constitution provides both the penalty of expulsion and the penalty of suspension for violation of the constitution or by-laws by officers of the local and international union, thereby impliedly recognizing a distinction between the status of one who is expelled and one who is suspended. Art. 6, sec. 17, of the constitution, which provides for termination or resignation of membership in the union, states that a member may resign only if he is in "good standing" and is not delinquent in the payment of any financial obligation to the international or local union. This being the case, once suspended for being in arrears in paying his fine, defendant had no power even to resign from the union until he paid his dues. The obvious implication of this provision is that a member suspended for being in arrears is still a "member" and amenable to union discipline.

*Is the union limited to suspending or expelling a member who has failed to pay a fine*

This is, of course, a request to rehear what was determined, contrary to the defendant's preferences, in *United Automobile, Aircraft & Agricultural Implement Workers v. Woychik* (1958), 5 Wis. 2d 528, 93 N. W. 2d 336, and *Local 248 UAW v. Natzke* (1967), 36 Wis. 2d 237, 153 N. W. 2d 602. We reiterate what was said in *Natzke*, at page 251. We therein concluded, citing with approval *Jackson v. Cleveland* (1865), 19 Wis. 422 (*400), and quoting 17 Am. Jur. 2d, *Contracts*, p. 906, sec. 445:

" 'Although the parties may, in their contract, specify a remedy for a breach thereof, that specification does not exclude other legally recognized remedies. A con-

tract will not be construed as taking away a common-law remedy unless that result is imperatively required.' "

The defendant, however, challenges the wisdom of the *Natzke* rule, primarily on the rationale explicated in a comment, *Court Enforcement of Union Fines*, appearing in 25 Washington & Lee Law Rev. (1968), 273. This article equates the obligations assumed by a union member to those of one who purchases a policy of insurance, in that, the commentator contends, the union member has no opportunity to bargain as to the terms of the contract. He therefore concludes that contracts should be construed against the union, and, hence, implied legal remedies, such as collection of fines in civil courts, cannot be pursued.

The validity of this position depends upon the premise asserted that a union member has no opportunity to bargain the terms that bind him. No evidence of this lack of bargaining power is put forth, and the assertion is contrary to the facts of this case.

The resolution herein was adopted after the defendant voluntarily became a member of the union and was adopted as a resolution upon the vote of the members at a meeting at which Scofield could appear, express his opinion, and cast his vote. While this is not the freedom of contract that exists between two individuals, it is the same freedom to acquiesce or dissent that is afforded any member of a club or association. There is no evidence that the "union" was the dictator of the resolution. The evidence is to the contrary. Certainly, this is unlike an insurance contract, where the insured has no voice whatsoever in contractual terms imposed.

Nor must it be forgotten, as was emphasized repeatedly in the NLRB proceedings and in the United States Supreme Court, Scofield could have escaped the burdens of union membership by either not joining the union or by resigning at such time as union policies displeased

him and when he still had the standing to resign. Scofield would have it both ways—all the privileges and prerogatives that he apparently associated with union membership but also a complete exoneration from the liabilities he agreed to when he joined the union and agreed to abide by its regulations. We are satisfied that *Natzke* was correctly and properly decided.

*Was the fine for "conduct unbecoming a union member" on so vague a charge as to be unenforceable*

While courts will not enforce contracts when the terms are so vague that they cannot with reasonable certainty ascertain the intent of the parties, they will, if possible, attach sufficiently definite meaning to the intent of the parties to enforce the contract. *Shetney v. Shetney* (1970), 49 Wis. 2d 26, 181 N. W. 2d 516. While the term, "conduct unbecoming a union member" is arguably vague (Summers, *Legal Limitations on Union Discipline*, 64 Harvard Law Rev. (1951), 1049, and Comment, *Court Enforcement of Union Fines*, 25 Washington & Lee Law Rev. (1968), 273), the term as used in the instant case is precisely defined by the resolution in which it appears.

The union resolution creating the production ceilings provided that violation of a ceiling by a member would subject him to a fine of one dollar for each violation. The $100 fine was levied against Scofield pursuant to the portion of the same resolution which provided:

"In case of persistent and/or flagrant violations [of the ceiling], a member may be charged with conduct unbecoming a union member."

This language leaves no doubt that repeated violations of the production ceiling constitute such prohibited conduct. The obligation of the union member in regard to production ceilings is not vague.

*Was the $100 fine a penalty rather than an award of damages in a contract action*

The argument unrealistically assumes the equivalency of an ordinary commercial contract and the union membership contract. We recognized in *Local 248, United Automobile, Aircraft & Agricultural Implement Workers v. Wisconsin Employment Relations Board* (1960), 11 Wis. 2d 277, 288, 105 N. W. 2d 271, that the levying of a fine was not merely the collection of damages, but was related to the power of a labor organization "to enforce solidarity among its members." It is obvious that the measure of damages is difficult to ascertain, however real the damage is to the union which seeks to protect its members from the damages of "unlimited piecework pay systems." *Scofield v. NLRB, supra,* page 431. This is precisely the type of situation where liquidated damages, if reasonable, are appropriate. The liquidated damages, or fine, in the sum of $100 appear reasonable in view of the dangers foreseen by the United States Supreme Court and in the absence of compelling reasons to the contrary.

*Was the resolution imposing fines for persistent violations of the production ceiling a portion of the contract*

The appellant relies upon *Local 248 UAW v. Natzke* (1967), 36 Wis. 2d 237, 153 N. W. 2d 602, and *UAW v. Woychik* (1958), 5 Wis. 2d 528, 93 N. W. 2d 336. Those cases held that a union's constitution and by-laws constitute a contract between the union and its members, which contract may be enforced in the state courts. The Fourth Circuit Court of Appeals in *Simmons v. Avisco, Local 713, Textile Workers Union* (1965), 350 Fed. 2d 1012, 1017, said:

"It is established law that a union cannot discipline its members except for offenses stated in its constitu-

tion and by-laws, and that the courts lack the power to recognize 'implied offenses' and thereby rewrite the union's constitution and by-laws."

This court does not disagree with the above statement, but it is apparent from its mere reading that the vice sought to be prevented is the imposition of discipline for offenses that are merely implied and are not clearly spelled out as obligations of membership. We see no reason why those obligations cannot be explicitly spelled out by methods other than the union's constitution and by-laws. In the instant case a resolution of the membership was passed that provided that, in case of persistent and/or flagrant violations of the production ceiling, a member may be charged with "conduct unbecoming a union member." As previously discussed, we conclude that the resolution as so passed was not vague. It imposed with precision certain obligations upon union members. We conclude that such resolution constitutes as much a part of the contract defining the obligation of members as does the constitution and by-laws. Article 15, sec. 2, of the by-laws provides in part:

"These rights [of members] shall at all times be subject to the rules of procedure governing meetings and other uniform rules and regulations contained in the Constitution, By-Laws and *other official rules of the Local Union.*" (Emphasis supplied.)

It appears clear, therefore, that rules and regulations binding upon members can be promulgated by other than the passage of amendments to the constitution or the passage of by-laws. As is usual in contracts of any kind, the terms therein may encompass provisions for creating additional binding terms. We conclude that such additions to the contract were effectuated by the passage of the resolution.

*Was the resolution binding upon the defendant under the
facts of this case, where the resolution allegedly
was not ratified by the international
executive board as required
by the constitution*

Article 36, sec. 3, of the constitution of the international union states:

"All subordinate bodies [which includes local unions] shall submit any and all laws governing said subordinate bodies to the International Executive Board for ratification of the same."

The resolution creating the obligations in regard to the production ceiling was forwarded to the international along with amendments to the local's by-laws. While the record reveals that the by-laws were properly approved by the executive board of the international, the record fails to show any approval of the resolution. Thus, on the basis of the stipulated facts, it is clear that this resolution was submitted to the international executive board, but it is not clear whether the international executive board ratified the resolution or failed to do so. The record is silent in this respect.

Following the imposition of the fine, Scofield wrote a letter to the international president, Walter Reuther, appealing the action of the local. In this letter, Scofield requested to be exonerated from the payment of the fine pending the appeal. Article 32, sec. 1, of the constitution provides:

"All subordinate bodies of the International Union, and members thereof, shall be entitled to the right of appeal. In all cases, however, the decision of the lower tribunal must be complied with before the right to appeal can be accepted by the next tribunal in authority, and shall remain in effect until reversed or modified. The international President may, upon written application by an appellant waive in whole or in part require-

ments of such compliance, where unusual circumstances would warrant such waiver."

In the letter to the international president, Scofield claimed, apparently to fulfill the requirements of "unusual circumstances," that there was nothing in the collective-bargaining agreement in regard to production ceilings nor were there any such provisions in the by-laws or the constitution. The request for waiver was denied, and Scofield was advised that the appeal would not be processed unless there was compliance with the requirement that the mandate of the local's tribunal be complied with.

It is well recognized that a union member will not be allowed to invoke the aid of a court to obtain relief from an allegedly wrongful action by a union unless he has first exhausted the remedies for appeal provided in the union organic law. 48 Am. Jur. 2d, *Labor and Labor Relations*, p. 251, sec. 334; Annot. (1963), 87 A. L. R. 2d 1099. This rule was followed in *Kopke v. Ranney* (1962), 16 Wis. 2d 369, 114 N. W. 2d 485. There we affirmed the trial court's action in sustaining a demurrer to a former union member's damage action for wrongful expulsion because the plaintiff did not plead facts showing he exhausted the remedies of appeal afforded by the international procedures of the union. We relied in part upon the policy considerations stated in Summers, *The Law of Union Discipline: What the Courts do in Fact,* 70 Yale Law Journal (1960), 175, 207:

" 'The doctrinal declaration that courts will not intervene in internal union disputes until all appeals within the union have been exhausted has, in theory, three underlying policies. First, union appellate tribunals may take corrective action, thus reducing the burden on the courts. Second, the benefit of the expert judgment of these tribunals might aid courts in making more-responsible decisions. Third, the deep and pervading principle of preserving the autonomy of unions constrains courts

to give the union full responsibility and opportunity to correct its own mistakes.'" *Kopke, supra,* page 373.

In the instant case, although in the internal union proceedings the defendant Scofield objected to the imposition of the fine on the ground that its provisions were set forth in neither the by-laws nor the constitution, the assertion that the resolution which explicitly imposed the obligation was not properly ratified was not made until the action for the collection of the fine was pursued in the civil courts of Wisconsin. It is clear from the record, therefore, that the union had no opportunity to either rectify the record, by showing that, in fact, the resolution had been ratified, or admit the lack of ratification for the purpose of disposing of the appeal on the ground that the rule was not properly promulgated.

Although in this case the union member does not seek affirmative relief as a plaintiff, we conclude that, under the rationale set forth above, where a union member seeks to avoid the enforcement of a fine and he claims as a defense some defect in the internal procedures of the union which he alleges are fatal to the union's cause, the union member must not only in the court plead such defects but must establish that he has exhausted his internal union remedies in that regard or that he falls within some exception to the exhaustion doctrine. Failure to so exhaust his internal remedies results in the union member's lack of standing to assert such defenses in a civil court.

*Kopke v. Ranney, supra,* recognizes certain exceptions to the exhaustion doctrine. Defendant claims that he should be exonerated from his duties to appeal within the union, because such appeal would be "futile." Such an exception is recognized. However, he failed to plead such alleged futility of appeal in his civil court answer, and nowhere has he asserted facts that show his case comes within the futility exception. A union member,

of course, may resort directly to the court without first exhausting internal remedies where the union's disciplinary action is without jurisdiction. 48 Am. Jur. 2d, *Labor and Labor Relations,* p. 252, sec. 334.

The claim that the union in this case was without jurisdiction is premised upon Scofield's assertion that he was not a member of the union when the fine was imposed. We have elsewhere in this opinion disposed of that contention, contrary to his claim. We do not find that the requirement of paying a fine as a prerequisite to an appeal is unreasonable. The employee agreed to this condition when he joined the union.

We conclude, therefore, that the defendant Scofield cannot now assert the invalidity of the resolution for failure to comply with the union's internal procedural requirements when he failed to make such assertion in an appeal and failed to exhaust his internal remedies in that respect.

*By the Court.*—Judgment affirmed.

ROBERT W. HANSEN, J. (*concurring*). In a case involving the same fine, the same union and the same union member as here involved,[1] the United States Supreme Court makes a specific reference to the exact case now before us. For the court, Mr. Justice WHITE stated:

". . . Petitioners refused to pay the fines, and the union brought suit in state court to collect the fines as a matter of local contract law. . . . (footnote 3)

"3 Unless the rule or its enforcement impinges on some policy of the federal labor law, the regulation of the relationship between union and employee is a contractual matter governed by local law. As the trial examiner put it in this case, the Board 'never intended . . . to suggest that the disciplinary action[s] in en-

---

[1] *Scofield v. NLRB* (1969), 394 U. S. 423, 89 Sup. Ct. 1154, 22 L. Ed. 2d 385.

forcement of [union] rules . . . were affirmatively pro-
tected under the Act, as opposed to merely being not
violations thereof.' It is thus a 'federally unentered en-
clave' open to state law.  145 NLRB at 1133" [2]

Our court's majority opinion gives no weight at all
to this footnoted reference in the action now before us.
Our majority opinion terms the reference and comment
only an ". . . 'aside,' by way of a footnote, wholly dicta
in this case, . . ." We doubt that state appellate courts
ought to follow law review contributors in pruning or
cutting out from United States Supreme Court opinions
statements they consider unnecessary or irrelevant. We
have no doubt that such scissors ought not be wielded
by the exact state court which a particular reference
in a particular case obviously was intended to aid and
assist.

Certainly it is transparently inaccurate to summarize
the footnote as no more than ". . . approval for the
trial examiner's statement. . . ." There are three sen-
tences in the footnote, not just one. The middle sentence
does quote with apparent approval the trial examiner's
holding that the National Labor Relations Act did not
prohibit the enforcement of the fine but also did not
affirmatively protect it against state court attack. There
are two outside slices to the sandwich. The first sentence
clearly states that unless a federal labor law is impinged
upon, the ". . . regulation of the relationship between
union and employee is a contractual matter governed by
local law. . . ." The third sentence says in summary:
"It is thus a 'federally unentered enclave' open to state
law." These express statements that pre-emption does
not apply gain added strength and applicability when it
is remembered that they are made, not in reference to
some class or category of cases, but in direct reference
to the very case now before us.

---

[2] *Id.* at page 426.

The issue in *Scofield* on which the United States Supreme Court divided was whether the enforcement of the union fine by court proceedings was prohibited by the National Labor Relations Act. The hitchhiker question was whether the National Labor Relations Act protected this area of union-member relationship from state court review and action. This question of whether there is pre-emption of the state's right to act did not have to be reached. No assertion of a state's right so to do was before the high court. Nonetheless, the court decision elected to set forth the existence of this pending state court action, and to term it related to an area "governed by local law." Greater significance, not less, is to be given to the high court's going out of its way to refer to the case before us, and to place it in a "federally unentered enclave."

The majority opinion cites the *Garmon* rule [3] as requiring state jurisdiction to yield when "it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by sec. 7 of the National Labor Relations Act, . . ." That is right, but the rule does not apply to a situation where the United States Supreme Court has stated, even by footnote, that an area is "governed by local law" and has become a "federally unentered enclave." It was well and good in *Natzke* [4] to defer to NLRB rulings as to enforcement of union fines "until such time as the United States Supreme Court has spoken . . . ." [5] Deference now should be to what the United States Supreme Court has said, no longer to what the NLRB earlier ruled. The shift in deference should be made easier by the fact that the *Natzke* confidence that the United States Supreme Court

[3] *San Diego Unions v. Garmon* (1959), 359 U. S. 236, 244, 79 Sup. Ct. 773, 3 L. Ed. 2d 775.
[4] *Local 248 UAW v. Natzke* (1967), 36 Wis. 2d 237, 153 N. W. 2d 602.
[5] *Id.* at page 246.

had not spoken while the NLRB had was itself based on a footnote, in a United States Supreme Court opinion.[6] Mr. Justice BRENNAN'S footnote (in *Allis-Chalmers*) was not termed an "aside" or "dicta" and ignored. It was quoted and relied upon. Mr. Justice WHITE'S footnote (in *Scofield*) is entitled to the same treatment.

So the writer would hold that this court is entitled, in fact very nearly directed, to determine here the legitimacy of the union interest furthered by the rule or resolution, the reasonableness both of the penalty imposed and the procedure followed, and the extent to which any expressed state law or public policy may be violated by the union-imposed production ceiling. However, here, since the United States Supreme Court included in its opinion in *Scofield* a full evaluation and review of the rule, fine, and procedure here followed, there is not much left undone or unsaid. For example, the United States Supreme Court stated:

"In the case at hand, there is no showing in the record that the fines were unreasonable or the mere fiat of a union leader, or that the membership of petitioners in the union was involuntary. Moreover, the enforcement of the rule was not carried out through means unacceptable in themselves, . . ."[7]

"The union rule here left the collective bargaining process unimpaired, breached no collective contract, required no pay for unperformed services, induced no discrimination by the employer against any class of employees, and represents no dereliction by the union of its duty of fair representation. . . ."[8]

---

[6] In a footnote to Mr. Justice BRENNAN'S opinion in *NLRB v. Allis-Chalmers Mfg. Co.* (1967), 388 U. S. 175, 197, 87 Sup. Ct. 2001, 18 L. Ed. 2d 1123, it is stated (fn. 37): "Not before us is the question of the extent to which union action for enforcement of disciplinary penalties is pre-empted by federal labor law. . . ."

[7] *Scofield v. NLRB, supra,* at page 430.

[8] *Id.* at page 436.

Perhaps, it could be argued that so full and complete a validation of the union rule and its enforcement was not required to reach and determine the issue of the National Labor Relations Act's applicability. But the writer finds the approval persuasive, if not entirely controlling, on the issue of whether the rule, fine and enforcement can be found to offend any legitimate interest or policy of the state. While concluding that federal pre-emption no longer applies to enforcement of union fines against members, the writer would find no state law or policy contravened here by the procedures followed.

Agreeing with the court majority as to other issues raised, the writer joins in finding affirmance required.